Good morning. Good morning. May it please the court, I'm Dennis Moran representing the appellant Resolute Industries. If I could reserve five I guess we'll do it that way. You'll have to keep track of your time and if we take a ton of it will be a little bit lenient. Which party presented the excerpts from the record? The one you application to this. My humor. Let's see if I can. Such as there was. Okay thank you. I'm gonna see if we can avoid a disconnect here. Oh. Sorry. Should I just go home? No. All right. May it please the court, I'm Dennis Moran representing Webasto the defendant. This this case was basically a product boat fire case. It's fundamentally a negligence case with a little bit of maritime overlay that comes in on the procedure. The issues raised on appeal fall into two sets. We have some issues from from Resolute's perspective against Webasto, the manufacturer of the heater unit, and we have some defense issues against against the plaintiff. And I thought I'd argue them that way and first take the Webasto issues. You mentioned maritime law as it appears that both sides agree that the restatement third is what informed the analysis. I think I think I agree. The more the 1990 or 98 version. Yeah to the plus to the extent the court's modified those things for maritime application. The facts are fairly straightforward. I'll be real brief about them. My client is a repair shop up near Anacortes. One of the things they repair these little boat heaters about this big. They're everywhere. These little diesel heater that heats the water and circulates it throughout Pleasurecraft. They're all over the place. That's a picture of one that saw fire. Yes. These are all over. They're very great. You can get a copy of that by the internet if you want. Is that on the internet? That's actually their exhibit. Okay. Webasto manufactures these and like every product that's put into consumer service, they have an instruction manual that tells people how to repair them. And like many companies that manufacture things like the heaters or lawnmowers and so forth, they have kind of a repair regime out there. They have these classes that teach people like my client how you repair these things. And one of these classes is taught by the authorized agent for Webasto, this outfit show marine. Now my client was repairing this shortly after he had actually gone to one of these repair classes where he was specifically taught how to do this thing. And one of the things he was taught, which is in the instructions, is you disconnect the power from the power source. Now, disconnect the power source can mean many things. After a fire, of course, everybody looks at 20-20 hindsight and says unplug and cut every single electrical line that possibly could have existed. Okay, but we don't operate 20-20 hindsight. We operate under reasonableness. And though this claim is in maritime, that's why it's pleaded as a breach of the warranty of workmanlike performance. It has a warranty name. It's essentially a negligence case because the standard is, did you use reasonable care in the repair? So it's really negligence. So the issue on the defense, from my client's perspective, was did Mr. Albrook, the repair guy, use reasonable care? The case he wanted to present was yes, because he had read the manual, he had gone to the repair class, and he had been specifically taught that this is how you disconnect the heater from the power source when you're working on it in the boat. Were there other ways to do it? Sure. Were there more 100% effective ways to do it? Sure there were. But this is what he was taught. Now here's where we fell first in the district court. Summary judgment was filed by Webasto, and of course we responded saying, Mr. Albrook went to this training class, and this is exactly what he was taught. And that, therefore, what he did was reasonable care under the circumstances. If he goes to an approved training course, they teach him to disconnect the power this way. He follows it. We've read the case, so why don't you get to the point. The point is, let's assume that that's a case where he went on and said, even if I assume that he went to that course, he still was negligent. Well, and here's, it's almost kind of, it's like a fruit of the poisonous tree thing. If she rules, and she did, the district court ruled as a matter of fact that he did not attend the course that he said he did. Essentially, what the court is ruling right there is this key witness who's going to testify about what he did and why it's reasonable is a liar as a matter of law. She just, it's a de facto ruling. He didn't go there. Everything else cascades out. Therefore, everything he says about what he did, everything he says about what matters, is just automatically suspect. The mistake that causes the problem in the case, from the defense perspective, was ruling essentially as a matter of law that our key witness was not telling the truth when he was telling the truth. And under any analysis, that should have been a we would have, when it's challenged, put on a whole bunch of more evidence because then you address the weight, not the admissibility, essentially. And we believe we would have prevailed. But having made that initial error and that departure, it caused virtually everything else to be prejudiced substantially against Resolute. The reasons that she offers, where she says, well, even if he did go to the course, they don't really, frankly, they don't really make much sense at the summary judgment stage. Those are more reasons that would have gone to the weight and with evidence going both ways. But once she says this, once the district court made this ruling, we don't have any opportunity to even address it, to bring more witnesses in, to maybe explain it better at trial, which is what one normally does when you're putting on the weight. So that initial error, when you look at it logically, cascades down and disrupts the whole ability to reasonably defend the case. And that was error. No, if there's any question about that. With respect to the second set of issues on the products, with respect to Webasto, let me just address this this way. Was there, first is the alternative design issue. And again, that was reasons set forth as a matter of law by the court, just frankly don't don't make much sense. Certainly at the summary judgment level. And I, before you move along, you said that you're relying on is having read the manual and gone to the class. Yes. Okay, my understanding is the manual, we have the statement which says the top of the burner itself says disconnect current before opening. Okay. And he did the, he turned off what he thought was a circuit breaker and that that would disconnect the current. Okay. He did turn off the circuit breaker. Turned it off. Okay, he turned off the circuit breaker. And then the manual says remove the burn, removing the burner unit, replacement of certain components is made easier if the burner unit is placed on a bench. He did do that, right? He took it out. No, no, see, and that's the point that that instruction you're looking at is taken out of context from the manual. But did he, did he take the burner out and place it on? No, he didn't remove the burner unit from the vessel at all. He was working on the, there's two ways to repair one of these burners. He took something out, so. Well, what he did is he took it apart and repaired it in line in the system. The instruction you're looking at says essentially when your repair requires you to remove the burner unit and take it over to a bench to do some other stuff on it, here's how you do it. No question about it. You have to unhook all the lines to it. But what, what he was doing was something that was perfectly reasonable, which was repairing the, repairing the unit in situ. And when you're repairing the unit in situ, you don't need to disconnect it from everything. Okay. And that's that instruction you're looking at is out of context. So basically what he says, he turns off the circuit breaker. So if I go downstairs in my house and I want to fiddle with the electric socket upstairs, and I push what I think is the right circuit breaker, I'm going to assume that when I stick my metal tool into the hopefully disconnected electrical outlet, I'm not going to get a shock, right? Because it's not going to electrocute me because I've turned off the circuit breaker. And I'm going to go ahead and stick my screwdriver in there and fiddle around, put my fingers in, do the whole thing. Or if I were a professional electrician, would I go in and just make sure that the wires that I'm about to touch have any current in them? Well, let me, let me put your analogy in proper context because it wasn't just flipping off the breaker. He observed that the unit was off. Now this unit, when it gets current, it turns on. Okay? And when there is no current running to it, it's off. Right? So the current, the unit... So it's always running? Now it's got, there are two thermostats. There's one internal to the system that says essentially when the water gets too hot, it then flips it off. But this was cold, so that wasn't in play. And there's an external thermostat, right, which is in line between the power unit and the system. Okay? So when the temperature drops below a certain temperature, you know, then the unit, ambient temperature, the unit will kick on. Because the thermostat will then, once it senses the low temperature, 40 degrees or whatever it is, will then allow current to flow through. Okay? So when he flipped off, when he looked at this, he knew that the power was off because the system wasn't running. And it hadn't been running recently, so the internal thermostat wasn't in play. And it was cold. And all of these things have a thermostat in line with them, so there was no power to it. There was no power to it when he was there. Had he checked it with his little checker, there would have been no power because the system was not on, because the thermostat. Now what he didn't know, what we all presume, was that this thing was wired around the breaker, the heater breaker. Right? But the fundamental question from his standpoint, the negligence analysis was what he did was reasonable. And we keep getting back to that. And we weren't allowed to present the case that essentially said, if you go to one of these approved classes and they tell you exactly how to do this, and you do exactly what they say, that that's reasonable. We weren't allowed to do that because she ruled he didn't go to the class. Well, she did rule in the alternative also. She ruled in the alternative, but I think I just address that. It really, I don't think those reasons are really valid. You also argued... I'm sorry. No, go ahead. When she said he didn't go to the class that he did, we're unable to say... Okay, we got that. So the other issue in this case, another issue, is also defective design. And you seem to be relying on the fact that there are switches, killer switches, in regular furnaces, household furnaces. And dead man switches are something that are in lots of things. So what's the evidence as to its applicability in this context? What did you present to the court? Paul Way, who is a, well, he's an electrical engineer. He's a forensic fire analyst that specializes in electrical designs and causes. And he testified that, look, there was, there could have been a dead man here. Every other furnace in everybody's home has them. It makes a lot of sense. They're easy to put in. You just need a little bit of a switch. Did he know anything about marine? He never said that it applied in marine context. No, no, he didn't. And where the court went on this issue was they kind of chased this ball thinking, well, because marine is different, it's somehow fundamentally different. It was, sure, marine is different. If you take a radio and then you put it on a ship, it's a marine radio. But there are certain safety aspects which are common, whether it's marine or shore side or whatever. And the way he presented it, the way we presented it, is simply this. Look, a heater is a heater, right? It runs a fuel system and it has an when you open the thing up, whether it's below your house or on a boat or, you know, anywhere, in a factory, you don't want that current running through. And it's easy to put something in to stop that current during the repair. It's a simple, it's just a dead man. And they're on trains, they're on heaters, they're on everything we use every day. And that was the presentation. And the objection seemed to be, well, we didn't have 100 experts showing that you really need one on a ship. Well, our argument was a ship in that respect, or boat, is no different than really a car or a bus or a house. A dead man on a heater, turning off the current when you open it to service it, is not, it should be there. And we were not allowed to present that. Councilor, you're down below two minutes if you want to save some time for rebuttal. All right. Yeah, well, let me just go on to two points with Webasto and then say whatever I've got left for rebuttal if that's okay. First of all, the loss of use is clear. The Aetna-Oppen case says we're following the Conqueror and says we're not following the Brooklyn. No loss of use for Pleasurecraft. Clear as a bell. If the court wants to overrule that point, and the court should overrule it, but it's good law here. The surveyor fees. Let me just be real clear about this one. These surveyor fees, these were essentially adjuster fees from the surveyor. In marine, surveyor is often an adjuster. And here, the surveyor fees, the ones that are in question, were fees for a surveyor who was hired by the insurance company to essentially adjust the claim. And these were included as damages. Essentially, these are internalized costs of the insurance company. They're not compensable damages under a first-party, for a first-party claim. And then I'll reserve whatever I have. Thank you. You may do that. I couldn't resist. That's this coming up. May it please the court. I'm Jerry Sale, and I represent the Appley and third-party defendant, Webasto. I'm going to take 10 minutes, and Mr. Gaspich, who represents Appley and Plaintiff Oswald, will take the other five minutes. The issue in regard to Webasto is whether the court correctly dismissed the Resolute's products liability claims alleging or claiming that there was inadequate warnings and defective design. You've heard a bit about that, although most of what Mr. Moran was talking about this morning was negligence, which doesn't, was whether his client was negligent, which doesn't have anything to do with these claims. The issue here, as we discussed, as was discussed a bit, was, first of all, let me take the defective design. In regard to that, we're talking about whether or not there should be a kill switch. I think dead man switch is the wrong word. Dead man switch is one, is a switch you have to hold on, and if the man dies, it releases the switch and it cuts off. I think we're talking about a kill switch. The important thing in regard to this, however, is the kill switch that Mr. Way, plaintiff's expert, was talking about was a kill switch that he proposed would operate not when the cover was taken off, a kill switch that would operate when the burner was removed. That's something completely different. Despite what is in the opening brief and, again, in the reply brief, Mr. Way did not propose a kill switch that operated simply when the cover was taken off. Which is the factual situation we're dealing with here? No, the factual, well, the factual situation, partly. I mean, certainly, if there's a kill switch that had been taken off. I guess what I'm trying to understand is Mr. Moran, I believe that's the correct name, indicated that his client was not intending to remove the burner at that point. He was simply opening it up. So the provisions here in 6.32, which deal with the removing the burner unit, don't necessarily apply. So what I'm trying to understand is the concept of a kill switch versus a dead man switch. You're really talking about the kill switch applies in the situation here where the burner was not being removed. Is that correct? Correct. I disagree with his description of what that manual means. Okay, what does the record show? Okay. In regard to this, first of all, it says disconnect before removing the cover, which needs special tools. And the cover's different than removing the burner unit, right? Exactly. Then you look at the unit, and in this unit you have a burner that's contained. And you can operate it so long as it's contained in there. And it doesn't actually pose much of a risk. The cover's off, but it's operable because it's contained. But once you remove the unit, once you take it out of that containment, then it presents a danger. Because then you can aim it at somebody, you can burn a wall, you can do whatever else. And that's what the removal provision has to do with. You can also repair it. But it wasn't removed in this case. It was removed from containment. It wasn't removed from the boat. It was sitting in a box where it's perfectly protected. If it burns, it burns in a heating containment. It's like if you had a fireplace and you have a fire going up the chimney, and you decide to take the fire out and place it over here. Well, what strikes me about the instructions that you've given us a copy of in this handout is that 6.3 suggests that this is merely a matter of some words, is made easier if the burner unit is first removed. Okay. Well, that isn't really anything other than saying, well, if this seems easier for you, if it seems more convenient, here's the way to go about it. Which is quite a bit different than an instruction like the warning saying disconnect the current before opening. I guess it seems entirely optional the way it's worded. Okay. Well, I've started on defective design. I'm going to slip back now then to warnings. In the warning. Yeah, I'm sorry. I'm mixing up the two. We should probably stick with one at a time. Can we get the fact, maybe I'm a little now confused also just on the physical facts. The burner is in a box. Is that what you're saying? Yes. Okay. And 6.3 says, talks about burner unit removed and placed on a bench. Council said, well, that doesn't apply here because it was never, that didn't happen. You said, well, it applies because it was, it's true it wasn't removed from the boat, but it was in effect placed on a bench in the boat. Is that right? If there wasn't a bench in the boat. I know, but there would have been a functional equivalent, placed on a cabinet or something. The idea is you're taking the burner out for the purpose of removing it. It was removed from a box that was fixed in place on the boat? From a part of the heater unit where it's supposed to be, where it's supposed to operate. Yes. So they took a component of the heating device and put it out. It was the burner component. They took the blower unit out of the containment unit. That's exactly right. So once they take the blower unit out, if it's hooked up and if it has power, it acts like a blowtorch. So are you saying 6.3 applies because the burner unit was removed? Correct. That's exactly right. I want to go back to, excuse me, your statement that expert witness way didn't talk about a kill switch in this sort of situation. As I read what he said, it was that the paradigm of the home furnace should be adopted and it requires a kill switch either when there's a removal of the cover or any partial disassembly. So it seemed to cover the gamut of either just the removing the protective cover from the outside or any process of disassembly. So I guess I didn't understand what you think he wasn't covering. I don't think he was covering anything in particular. He was talking about, well, okay, he was talking, he said that in this situation, in the marine application, you can have a kill switch that works at the time that you're removing the burner unit. That is, after you've had a mechanic remove the cover. Well, I know that's what you're saying, but I'm looking at what he says at page 772 where he talks about, before he says, look, the home furnace paradigm works for marine also, and I know you don't necessarily agree with that, but that's what he says, and he says that in the home situation, it protects against either removal of the protective cover or the partial disassembly, both situations. Except the kill switch, I don't think he says otherwise, that the kill switch in the home application is essentially, and this is what's different about it, the home, and he doesn't bridge this gap. In the home situation, the kill switch operates when you pull the cover off, because that can be done by a consumer, and it can be done by children, and it can be done inadvertently. And what we have here is a different situation where you remove a cover only with the difficulty that knows that a mechanic's going in there. But that's, okay, that goes to your audience component of design defect. But the question in the design defect is also, is there a reasonable, cheap alternative to, and he put forward, you know, the common one is a kill switch. No, the difference is that the kill switch on that is a kill switch that we're not talking about that. What we're talking about here is a kill switch. Where does he say it's easily removable cover? It says, Opinion 3, the burner's unit should have been designed, manufactured, and distributed with a built-in safety switch to automatically disconnect power to the heater in the same manner as commonly used in a home furnace. Asked for the basis. His answer, in home furnaces, the units were and are currently provided with manufacturers recognize the extreme danger in removing protective covers or partial disassembly. You argue, as I understand it, well, this is a situation where it's very difficult to get the cover off. Okay, that suggests that there's maybe danger, but he doesn't talk or qualify it about removing protective covers if it's easy or difficult to get off. He talks about the danger or partial disassembly, which you just said, was done here. I think the word partial disassembly, what he's talking about, and for the information we have, I don't think there is any kill switch in regard to a furnace that has to do with taking the burner unit out. It has to do, as he says there, with removing the door. If you have a kill switch when you remove the door, of course, it also operates to any further operation. You know, it strikes me that you're making a really good jury argument, but we're dealing with summary judgment here. And you're saying, well, no, no, he didn't mean this. We have to take the inference being that, but when we're looking at summary judgment, we have to take the inferences from his testimony in favor of resolute, not in favor of your interpretation, and I just have some difficulty with that. Now, what we do in regard to his testimony is we have to go through the Daubert analysis, and we have to determine whether the court abused her discretion in determining that what he was talking about in regard to this kill switch had any application and could get past the Daubert gateway. And in this case, he showed absolutely, I'm sorry, I'm talking over you. That's, no, no, you're not, but I'm just disagreeing with the way you read that what the district court said here. She says she sets aside Ways Qualifications as an expert because you didn't attack it until the reply briefing. And basically, what she says is, well, the absence of an industry standard is dispositive because if it isn't in other, she says basically, as I read it, because you can't prove that other marine applications have actually used what you propose, it's irrelevant as a matter of law. And I just found that really startling because that basically says there can never be a first design defect case because if it isn't in the industry, no plaintiff can ever rely on it as being a design defect. That's her reasoning, it isn't Daubert analysis. I'm, I think it is. I'm in a horrible dilemma here. I'm beating into Mr. Gaspis. Give him some time, please answer my question. Certainly. I think what the court has said in this case is, and this is where we are trying to keep our eye on the ball, in regards to what he's proposing is a kill switch that operates when this unit is being repaired. When a mechanic has gone into the unit. We're talking about a kill switch in that situation. A kill switch when the hood is open and the mechanic is in the car. But that's not what he said. That's not what who said? Mr. Way. That's what Mr. Way said. He just quoted, she just quoted it to you. Mr. Way said at page 773 and in response to questions at 777 and 79, 779, because he was asked, he was asked particular in 777 and 79 through that section about if you had a kill switch when you pulled the door off, wouldn't that interfere with the repair that you're trying to do? Wouldn't that interfere with what's trying to be done inside? How would that work? And he said, no, you'd understand. I'm talking about a kill switch that applies when you remove the burner. And he's very clear on page 773 that what he's talking about is a kill switch that operates when you remove the burner. So this is a situation where, to be clear, the cover has to have been removed by a mechanic. The power should be disconnected so it can't operate on a system that Webasto has nothing to do with. Webasto doesn't have anything more to do with that circuit breaker than the manufacture of a lamp has to do with the wiring of your house. They have nothing to do with that. So it should be disconnected. Do you agree that since this is a summary judgment motion that we are to construe his testimony in a way that would be, shall I say, generous to resolute in this situation? I mean, he did mention the cover. He did. I know you're saying that later on he distinguished that in some way. But the reality is, just as a matter of common sense, if you have a kill switch when you open the cover, you know, apparently it's not that difficult to do. Doesn't, shouldn't that enter into a jury verdict as opposed to a summary judgment? He's not suggested that. I don't think you can read him to say that. I think he's very clear on page 773. We understand your position. And I think we would like to hear from the plaintiff's counsel at this point. Thank you. And we put his time back to five minutes since we kept the other counsel through no fault of anybody else's. So, Mr. Gaspich. Thank you, Your Honor. My name is Anthony Gaspich. I represent the Plaintiff Appellees, Mr. Oswald, and Federal Insurance Company. There are basically three issues on appeal involving Mr. Moran has raised regarding the Plaintiff Appellees. One, I'd like to just make a clarification regarding survey fees. The three are survey fees, loss of use, and the third is causation. On survey fees, Mr. Moran said that the fees being claimed were essentially adjusting fees. That's an argument that wasn't raised in the briefing and preserved below so that this Court should ignore that argument. What he did raise is two arguments. Basically, that Federal did not pay the survey fees. That was the first one. The second one was that they were not incorporated in the subrogation receipt. So, therefore, the Federal cannot collect them. Those issues were addressed in the briefing. On the first issue, essentially the evidence put before the Court below was that Federal did, in fact, pay it. Their name was on the check. They were listed as the underwriter in the survey report that was done by Mr. Cater, the surveyor, and Mr. Rochelson who testified he worked for Chubb, but, in fact, he said he adjusted it on behalf of Federal Insurance Company. So, Federal Insurance Company did, in fact, pay those fees. The second point that they raised, that basically it's not in the subrogation receipt, therefore, you can't collect it. Well, that's incorrect because the legal principle that applies to this is equitable subrogation. And for the cases that are cited in the brief show you don't have to follow the technical niceties of making sure it's incorporated then. If the insurer pays the loss and it's a recoverable loss, and that's something that Resolute hasn't challenged below, the fact that you can recover these. I think that's what Mr. Graham was trying to raise at this point, but that wasn't challenged below. On appeal, in other words, that an owner can get a surveyor to try to determine what the scope of the damages are to his vessel, and then, if necessary, and the court found that they were reasonably necessary in this case, to oversee those repairs to try to make sure that the repair isn't slipping things in, for instance. Make sure that what they're doing is in conjunction with what was agreed to on the joint survey, those are recoverable. So under the, in this instance, they, under equitable subrogation, they would be entitled to collect those fees. And the fact that it wasn't, the amount, $12,000, wasn't placed into a receipt is not necessary. On the, I have two minutes. We have two minutes. Focus on that. The precedent talks about if you can establish that there, you know, this vessel would have been placed into commercial use. Now, his was not placed in commercial use in the sense that the cases are talking about it, you know, sending it out, using it as money making. For him, it was saving money on housing. So how do, how does that come in under the, there's no profit to, you know, profit factor, Ed, it's a fixed cost that's, or a variable cost that's incurred for him to pursue his profession as a flight attendant. Yes. Your Honor, I think you put your finger right on the point. And what we. I try to do that. After I disconnect the electricity. After you disconnect the electricity, yes. Open and the conqueror stand for the principle that a vessel used strictly for pleasure, you can't recover for. Now, the conqueror also says, as you indicate, that there has to be some sort of commercial context for, they use the word profit. And profit under, if you look at the Merriam-Webster dictionary, normal is defined as a gain. The question is, was there some business related gain that related to the use of this vessel? This wasn't a pleasure use. This actually is something that falls in the middle because the fact that it's a pleasure boat doesn't preclude by itself. It's not a status argument. That's what Resolute is arguing. It's status, a pleasure boat, you can't get it. That's not the case. If you charter a pleasure boat, for instance, you can recover that if you can show with reasonable particularity what the loss is. This falls in the middle. There are no cases that deal with this. So the question, to come back to it, is why is this a business loss? Well, this could be analogized to an unreimbursed employee expense. Mr. Oswald purchased this boat and used this boat for the purpose of a dwelling because he lived in Washington and commuted to Oakland. He used this in conjunction with his occupation. Prior to this, he had to incur personal expenses of a hotel. Would that be true if he just rented an apartment? Well, that's what he did beforehand. Right. But I'm just saying that this is maritime law. But the reality is you're saying that because, for his convenience, he decided to live on a boat as opposed to in an apartment. He's entitled to some recompense here. But if he just had rented an apartment, there would be no ability to make a claim here, would there? On this point. Well, it's hard to draw that analogy because the apartment is shore and this is on the boat. Right. I would say what I would say is. The same purpose. Yes. If the apartment burned, he would be entitled for the loss related to if he, in fact, lost or incurred a cost due to that. It's hard to draw a direct analogy because of the particular circumstances here. And that's where it's a little troubling. But if you look at specifically what this was for, this is not when he's cruising in the San Juans in the summertime. It's just specifically brings it down there to stay on. And the gain or the, that he got from this is saving expense. I understand that. But I'm not following in response to Joe Smith's question. You said if it, why can't you draw the analogy to apartment? Suppose he decided instead of paying hotel fees, he could get a sublet in an apartment when he was, during the winter so he could avoid commuting. So he had a place there. And that place burned. Down through negligence of some, you know, the heater. The furnace burned the place down. Would he, under normal insurance, tort law, whatever, have been able to include that in his damages? Yes. What I would say is if he had to now go out and find a new dwelling to live in, and it's more expensive than what he was experiencing before, then he would, in fact, be able to recover for that. With the normal requirements of mitigation, he can't go to the, you know, the Taj Mahal or something, but yeah. Exactly. And that's the gain issue here. See, we typically look at profit in terms of, well, money in the door. But it's also, if you save expenses, that's the equivalent of that. And that's what Mr. Oswald was doing here. Now the question is, did it have a business purpose? Well, this, the only evidence before the court and in the circumstance was that this was used in conjunction with his occupation. So we would submit that is an appropriate business use for this. He did have a savings from it, and therefore, the additional cost that he had to do, which is now the hotel expense, that he didn't have to incur before. Where's his domicile? Oakland? No, in Washington. Okay. So this is his domicile? In Washington, yes. Could you not say that the business purpose would have been the other way, in Oakland, because his real home is here? I don't think I'm following exactly. It's where the boat was. Where the boat was, right? Well, the boat in the summer, he would bring it back here. And then in the, because he would choose at that point to use it for his own purposes. Right. But in the wintertime, he would bring it down there solely for this occupation-related purpose, to just use it as a dwelling. So the amount of money represents only the time when it was in Oakland, and not the time when it was in the San Juans? Correct. Okay. He, there is no claim in the case for, Mr. Oswald did incur hotel charges over the summer. So the only charges he claimed are when it was specifically used to go down there in the winter as a dwelling, because even though he incurred those costs in the summer, he chose not to bring the boat there. So there only, it's only claimed for the time he was using the boat down there for his occupation. Thank you, Counselor. You've exceeded your time considerably, but it was very helpful. Thank you. And you may have a minute for rebuttal. Well, let me just pick that up, because the standard that Mr. Gaspis just proposed, the concept that if there's any business-related gain whatsoever, therefore it's compensable and falls outside the Conquer rule, I don't think squares with the Brooklyn case. Because I recall the Brooklyn case, the Supreme Court said no demerge charge there. And in that case, the party seeking the financial benefit had a couple of other boats and had made the argument that, look, we used our other boats to, but those boats had additional depreciation and cost of running them and so forth. And I think the Supreme Court said, well, no, that doesn't count, but then goes on and talks about the Conquer and says, in some circumstances, it might count. So what we have here, use of the boat for when you're up in Seattle area, seems to me a far less business-related expense than the one identified in the Brooklyn, which the Supreme Court said no to, I think, if I got that right. Let me just say one thing about this issue we haven't talked about, foreseeability. And it's in this context. There was much made at trial. And so there wasn't an argument about foreseeability. So this is beyond rebuttal. It goes to the design issue. Okay. Go for the design issue. Okay. Much was made in trial about how Mr. Albrecht, a GED repairman up in Anchorage, should have, you know, was negligent because he didn't anticipate, should have foreseen the screwy wiring that occurs in all these boats. Well, if that's the case, let's apply that to Webasto. If a GED guy in Anchorage who repairs these things should generally be aware of screwy boat wiring, shouldn't the company that makes these things and sells thousands of them throughout the world be generally aware that the people who are putting them in their boats might have screwy wiring and, therefore, put a kill switch in? Because there's no question if a kill switch would have been here, a simple, cheap alternative, this doesn't happen. Thank you, counsel. We appreciate the arguments that all of you have brought to us in this very interesting case, and it is submitted.
judges: Graber, Fisher, Smith M.